703 So.2d 158 (1997)
Thelma RILEY and James Riley
v.
RELIANCE INSURANCE COMPANY and Lake Terrace Center, Inc.
No. 97-CA-0445.
Court of Appeal of Louisiana, Fourth Circuit.
November 19, 1997.
Rehearing Denied December 30, 1997.
*160 Christopher J. Bruno, Janine C. Williams, Bruno & Bruno, New Orleans, for Plaintiffs/Appellants.
John I. Hulse, IV, Gwendolyn S. Hebert, Hulse & Wanek, New Orleans, for Defendants/Appellees David Pesses and American Central Insurance Company.
Before BYRNES, JONES and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
Thelma Riley and her husband, James Riley, sued Lake Terrace Center, Inc. (the Center) and its insurer, Reliance Insurance Company, for damages allegedly sustained when Mrs. Riley lost her balance and fell while exiting the Wash and Dry Cleaners located in the Center. James Riley sought damages for loss of consortium and mental anguish. Reliance answered, demanding trial by jury. Reliance subsequently filed a third party demand against David Pesses, d/b/a All Star Cleaners, the Center's lessee, and his insurer, Commercial Union Insurance Company, Ltd. Pesses and Commercial Union answered the third party demand and the Rileys's petition. The Rileys amended their petition to add Pesses and Commercial Union as defendants, to which answer was *161 timely filed. Reliance filed a technical amendment to its third-party demand.
The Rileys settled their claims against the Center and Reliance, and dismissed their suit against those defendants, reserving their rights against the remaining defendants. Within the delays set forth in La.C.C.P. art. 1733 Pesses and American Central Insurance Company (incorrectly identified previously in the proceedings as Commercial Union) were granted trial by jury.
Following trial on the merits, the jury found that Pesses, the Center and Mrs. Riley were at fault and that their fault was a cause in fact of harm to Mrs. Riley. The jury allocated the fault as follows: 16.25% to Pesses; 23.75% to the Center, and 60% to Mrs. Riley. The jury awarded $50,000 in general damages, $13,250 in medical expenses, past and future, and $92,248 in loss of past income and diminished earning capacity. The jury did not award Mr. Riley damages for loss of consortium, service and society. Based upon the verdict on special interrogatories, the trial court entered judgment in favor of Mrs. Riley against Pesses and his insurer in the sum of $25,267.12 with interest from judicial demand, assessed $1500 in expert fees against the defendants, cast the plaintiff for docket costs and dismissed James Riley's action. From this judgment, the Rileys appeal. We reverse the judgment dismissing James Riley's claim for damages for loss of consortium, service and society, and affirm the remainder of the judgment.

STATEMENT OF FACTS
Thelma Riley was sixty-three years old when she testified at trial in August, 1996. She graduated from St. Mary's Academy and Southern University and did graduate work at Southern and Tulane Universities in the field of Social Work. As an attendance social worker with the Orleans Parish Public Schools, she did counseling, consultations, educational placement, evaluations and otherwise worked to see that children with various problems remained in school. Her work included home and interagency visits, and attendance at conferences and workshops. She testified that she was independent and able to do most things by herself before her accident, except for nighttime visits on which she brought her husband for safety reasons.
She testified that the week prior to 7 August 1993, she had brought some curtains, bedspreads and comforters to Pesses's laundry to be cleaned, washed and dried. On 7 August she returned, was happy to find her laundry had been cleaned, and she and the clerk piled all the laundry in Mrs. Riley's arms. The clerk opened the door for Mrs. Riley. As Mrs. Riley stepped down, she fell because the step was steeper than she thought it was. She sat for a few moments and was ultimately helped to her feet by the laundry manager, who gave her a number to call if she were hurt.
Mrs. Riley testified that she had a painful night, took Tylenol and rubbed herself with alcohol. Three days later, she saw Dr. Miller, who told her he would examine her and take x-rays to determine if the pain was from her fall or from her pre-existing arthritis. His plan was for her to take heat treatments and ultrasound. She saw Dr. Miller an average of twice a week for heat treatments which increased her mobility and decreased pain, except in her back and knees. Her neck, elbows, arms and shoulders improved. With the help of her associates, she was able to continue working.
Her attorney then referred her to Dr. Seltzer, an orthopedist, who took x-rays and advised her that she had serious arthritis. He continued heat treatment and gave her pain medication. Eventually, Dr. Seltzer performed arthroscopic surgery on an outpatient basis on her right knee and subsequently performed a total replacement of the right knee.
Mitchell Allan Wood testified for Mrs. Riley as an expert in architecture, construction, code review, building code enforcement and the Life Safety Code. He gave the opinion that since 1967 building and life safety codes have required a level landing outside a doorway or a means of egress, and that the doorway in which Mrs. Riley fell failed to meet that standard. On cross-examination, Wood admitted that there was no code violation at the time the building was constructed, and that exemptions from the 1967 Life Safety *162 Code permitted this type of step down at an exterior door so long as the step was not in excess of seven and one-half inches; further, he admitted that the 1980 ANSI standards did not apply to buildings constructed prior to 1978. He also admitted that the Life Safety Code in existence in 1993, at the time of the accident, permitted a step down of eight inches. It was suggested that the entry could have been made safer by installation of a ramp, as had been done by two other tenants of the center, or by installation of signage containing a warning to step down.

STANDARD OF REVIEW
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
We are mindful of the standard of review of the verdict of a properly instructed jury.
"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... [A]ppellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.... When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... [Where] a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart, supra. Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts[1], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell, 650 So.2d at 745.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
FIRST ASSIGNMENT OF ERROR: The jury's allocation of fault among the parties was clearly wrong.
In our review of the jury's allocation of fault among the parties, we are guided by Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), pp. 7-8, 666 So.2d 607, 610-611. In that case, the Louisiana Supreme Court requires intermediate courts of appeal to *163 consider the trial court's allocation of fault under the same standard of review we apply to awards of general damages:
"[B]y analogy [to the review of awards of damages for personal injuries] the trier of fact is owed some deference in allocating fault, for the finding of percentages of fault pursuant to the comparative fault article. La.Civ.Code art. 2323, is also a factual determination. [citing cases].... [T]here is an analogy between excessive or inadequate quantum determinations and excessive or inadequate fault percentage determinations. In both, the trier of fact, unlike the appellate court, has had the benefit of witnessing the entire trial and of reviewing first hand all the evidence.... After the court of appeal finds a "clearly wrong" apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion."
Thus, Clement tells us that the allocation of fault is not an exact science, or the search for one precise ratio. Rather, it is an acceptable range and any allocation by the jury within that range cannot be "clearly wrong." In Clement, the Supreme Court held that any allocation of fault falling between a ratio of 50/50 and 75/25 would be reasonable. This very broad range is illustrative of the analogy referred to in the passage quoted above from Clement, comparing fault and quantum determinations. Mindful that in quantum determinations, Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), affords the factfinder "great, even vast" discretion, the Clement analogy mandates this Court to afford considerable latitude to the trial court in matters of fault allocation.
It is one thing for Mrs. Riley to suggest that an allocation of 50% fault instead of 60% fault would have been within the acceptable range. It is much less persuasive to argue that her 60% fault as found by the jury is beyond the range that would also include 50%. Although it is not impossible that a review of the record might support 50% as an upper limit of fault allocable to Mrs. Riley, such an adjustment would on its face be the sort of micro-management of fault allocation by this Court which Clement would not permit, absent compelling support in the record.
We find nothing in the record to support the Rileys's suggestion that Mrs. Riley's fault allocation should be reduced and the allocation to Pesses and his insurer should be increased. We cannot say that a reasonable trier of fact could not asses Mrs. Riley's fault at 60%. The suggestion that any allocation of more than 50% of fault to plaintiff in a premises liability case is unreasonable overlooks common experience as well as decisions of this Court. See Waller v. Wal-Mart Stores, Inc., 563 So.2d 1346 (La.App.4 Cir.), writ denied 568 So.2d 1059 (La.1990) and Robertson v. Popeye's Famous Fried Chicken, Inc., 524 So.2d 97 (La.App. 4 Cir.), writ denied 526 So.2d 802 (La.1988). In premises liability cases such as the instant case, the trier of fact may consider whether plaintiff's conduct resulted from inadvertence or involved an awareness of danger, and the extent of the risk created by the conduct. See Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985).
The jury would not be unreasonable in concluding that Mrs. Riley should not have undertaken a step that she had previously negotiated and which all parties agree was steep and presented some difficulty when she had obstructed her view voluntarily with a large pile of laundry, made up of severable loads that she could have taken, one at a time, in a manner in which she could have seen the step and negotiated it successfully. Clearly, the jury could have concluded reasonably that Mrs. Riley should have asked for assistance or divided her load into more manageable and smaller loads which would have allowed her to see what she should have seen and avoided her injury. The jury could have been impressed by the fact that Mrs. Riley's trial testimony concerning what she carried and how she carried it was impeached, at least in part, by her prior deposition testimony, in which she testified that she carried two separate packages at the same time, stacked up to her chin. Recognizing that Mrs. Riley was a mature person, holding a college degree and having had a significant *164 career as a school-based social worker, the jury would not have been unreasonable to conclude that by the time of trial, Mrs. Riley recognized her error in having attempted to carry the two loads at once, and sought to restructure the event in her trial testimony.
In light of the applicable standard of review, we find that this assignment of error is without merit.
SECOND ASSIGNMENT OF ERROR: The general damages award was unreasonably low in light of Thelma Riley's injuries.
Our initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Youn, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co. Inc., 294 So.2d 803 (La.1974).
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges the jurisprudence is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, supra.
The jury's general damage award is not obviously the result of passion or prejudice, and bears a reasonable relationship to the elements of the proved damages. Many rational triers of fact could have decided that a higher or lower award is more appropriate, but we cannot conclude from the entirety of the evidence viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the award of general damages at the level set by the trial judge or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason." Bartholomew v. CNG Producing Co., 832 F.2d 326 (5 Cir.1987); Youn, 623 So.2d at 1261.
Stated another way, the standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir. 1991).
From our review of the record in its entirety, in the light most favorable to the prevailing party, it is not evident that the jury abused its great, even vast discretion when it evaluated Mrs. Riley's injuries and the pain associated with her 1993 fall. We note that the jury found that Mrs. Riley's fall aggravated her previous arthritic condition to the extent of 30%. She had undergone both an arthroscopy and total knee replacement surgery which, according to Dr. Seltzer, gave her a 25% disability in her lower extremity. Her co-workers testified that she worked while in constant knee and back pain, that they helped her with her work and with getting around the office because of her inability to use the stairs or to walk for long distances. Her husband testified to her inability to sleep comfortably, cook, clean their house, drive, or socialize with her friends.
Because the evidence relating to Mrs. Riley's pain and suffering was not controverted and because we cannot say that this award is so low that it offends the conscience or shocks the sensibilities, we will not disturb the jury's finding and affirm the award of general damages.
*165 THIRD ASSIGNMENT OF ERROR: The jury's failure to award damages for loss of consortium to James Riley was clearly wrong.
The record is clear that James Riley was required to assume many of the daily duties previously performed by his wife, and that her injury put a strain on their marital relationship and diminished their ability to pursue many activities they had enjoyed together. His own sleep pattern was broken by his wife's inability to sleep comfortably, and her inability to drive caused him to drive her to work, doctor's appointments and other errands.
James Riley's testimony was uncontroverted and established a claim for loss of consortium. We find that the jury abused its great, even vast discretion, in failing to award damages on this claim. We reverse that portion of the judgment dismissing James Riley's claim for loss of consortium and award him $2,500 as reasonable compensation for this element of damages.
FOURTH ASSIGNMENT OF ERROR: The jury's award for past lost wages, diminished earning capacity and fringe benefits was clearly wrong and inadequate.
Thelma Riley testified that she intended to work until age seventy or near that age. She testified that she entered the Deferred Retirement Option Plan (DROP), a two-year program that allows state employees to double their present salaries during the time they are in the program while being classified as "retired."
Dr. Melville Wolfson testified that her diminished earning capacity at the time of trial, $240,607, reflected her annual earnings at the time of trial multiplied by the number of years she would have worked until attaining the age of seventy. On cross-examination, Dr. Wolfson testified that if Mrs. Riley were able to find a job paying her approximately 90% of her income at the time of the injury, then the $240,607 figure would be reduced by $216,546.30.
Jennifer Palmer, a vocational rehabilitation counselor, testified that Mrs. Riley's educational background, including a college degree, work experience and present salary would qualify her for several positions compatible with Mrs. Riley's field of expertise and located by Ms. Palmer in the classified section of the local newspaper. Each position offered a negotiable salary between $25,000 and $30,000 a year.
Considering the totality of the expert testimony presented to the jury on the issue of Mrs. Riley's lost earning capacity and future earnings, and applying the standard of review discussed hereinabove, we cannot say that the jury was manifestly erroneous or clearly wrong in its award.
FIFTH ASSIGNMENT OF ERROR: The jury's award of past and future medical expenses was clearly wrong and inadequate.
The jury's award of $13,250, or 30% of the total medical expenses introduced into evidence, reflects its apparent determination that the accident aggravated Mrs. Riley's pre-existing arthritic condition by 30%. The record is replete with medical testimony that Mrs. Riley had a long-standing arthritic condition in her knees and back.
While Mrs. Riley testified that she was asymptomatic prior to the accident, this testimony was impeached by the history she gave to Dr. Terry Habig, defendants' examining physician and her deposition testimony in December 1994, that she had a history of pain and swelling in both knees related to arthritis and that she had taken Naprosyn, prescribed by her family physician prior to the accident, to relieve these symptoms.
The jury also had before it the report of Dr. Gerald Miller, the first physician to treat Mrs. Riley after the fall. His treatment began three days after the accident, on 10 August 1993, and continued for five months, through 10 January 1994. Her complaints to Dr. Miller were of pain in the neck, shoulder, back and legs. He found tenderness as well in both her knees. On subsequent visits, Mrs. Riley complained only of neck and back pain, until on 15 December 1993 she complained of tenderness in both knees. During the January, 1994 visit, Dr. Miller found that the right knee was symptomatic, but both knees revealed a full range of motion.
*166 This report was contradicted by Mrs. Riley's history given to Dr. Seltzer on 9 December 1993, in which she complained of chronic pain in her right knee ever since the accident. Dr. Seltzer admitted having seen Dr. Miller's report, but denied familiarity with its details. His opinion was based on Mrs. Riley's statement to him that she had been asymptomatic prior to the accident, a statement impeached as noted herein, by her history to Dr. Miller and her deposition testimony. This discrepancy between what Mrs. Riley told her initial treating physician, Dr. Miller, and Dr. Seltzer, to whom she was referred by her attorney, could form the basis for the jury's conclusion that the accident was not the sole cause of her knee replacement surgery and back problem.
Both Dr. Seltzer and Dr. Habig described the pre-existing arthritic condition as having resulted in Mrs. Riley's knee having been worn outthe cartilage having worn away to such an extent, described by Dr. Seltzer as "end state arthritis", that the tibia bone and fibula bone were actually rubbing against each other at the knee joint. Both Dr. Habig and Dr. Seltzer testified that the arthritic condition had caused the bones actually to wear away.
Dr. Seltzer testified that the knee replacement surgery replaced the surfaces destroyed by the arthritic condition that has pre-existed the accident. In both his deposition and trial testimony, Mrs. Riley's treating physician testified that the damage to the wearing away of the first layer of cartilage, the wear shown on the bones, and the damage to the menisci were related solely to the pre-existing arthritic condition. When asked whether it was more likely than not that the loose bodies found within the knee and synovitis were related to the accident and not to the pre-existing condition, Dr. Seltzer replied, "Again, they would be equally likely." Dr. Habig essentially expressed agreement with these conclusions.
It is the jury's province to consider and weigh the medical evidence to determine what portion of the total medical expenses of $44,664.26 represented aggravation of that previous condition by the effects of Mrs. Riley's accident. There is ample medical testimony from Mrs. Riley's treating physician that the knee replacement surgery was as easily attributable to the pre-existing arthritis as to the accident. Such testimony does not sustain Mrs. Riley's burden of proof of injury by a preponderance of the evidence. This testimony does support the jury's determination that the accident in question aggravated the pre-existing injury to the extent of 30%.
The jury also heard testimony from Dr. Habig that Mrs. Riley's history of increased knee pain immediately after the accident with no further mention for the next four months is consistent with his experience of patients with severe arthritis who suffer a temporary aggravation due to injury. Therefore, under our standard of review, we find the jury's conclusion concerning Mrs. Riley's knee replacement not to be manifestly erroneous or clearly wrong.
Mrs. Riley suggests that the jury's award failed to consider her alleged back injury. However, both Dr. Miller's records and Dr. Seltzer's testimony reflect pre-existing degenerative arthritis in Mrs. Riley's back. Dr. Miller reported 90-95% normal range of motion in Mrs. Riley's back three months after the accident, and this resolved to some pain and stiffness by January of 1994. Dr. Miller wrote to Mrs. Riley's attorney at that time that he expected to discharge her within three to six weeks. Dr. Seltzer testified to x-ray and MRI results tending to show degenerative changes in Mrs. Riley's lower spine, and would not give a definite opinion that she had a herniated disc at L4-L5. In his deposition, Dr. Seltzer testified that the indication of a possible small herniation at that position could just as readily be the result of the degenerative changes to Mrs. Riley's back or of the accident. As in the case of the knee replacement, this evidence falls short of the preponderance of proof required of Mrs. Riley. This evidence supports the jury's determination to limit recovery of the medical expenses to 30% of those claimed by Mrs. Riley.
SIXTH ASSIGNMENT OF ERROR: The trial court's refusal to instruct the jury concerning the weight to be given to the testimony of Thelma Riley's treating physician constitutes reversible error.
The reviewing court must exercise great restraint before reversing a jury *167 verdict on the grounds of erroneous jury instructions. The question to be determined is whether the jury as misled to the extent that it was prevented from dispensing justice. Clark v. Jesuit High School of New Orleans, 96-1307 (La.App. 4 Cir. 12/27/96), 686 So.2d 998, citing Brown v. White, 405 So.2d 555, 560 (La.App. 4 Cir.), aff'd 430 So.2d 16 (La.1982). As a reviewing court, we are further guided by the principle that the trial judge is not in error when he refuses to give a requested charge where the charge is included in his general charge. Drury v. Kitchen, 94-0410 (La.App. 4 Cir. 11/17/94), 645 So.2d 1286, 1289, writ denied 94-3098 (La.2/9/95), 649 So.2d 425.
Under the established jurisprudence of this circuit, the jury was entitled to place greater weight on the opinions of Mrs. Riley's treating physicians than on those of doctors who treated her only for purposes related to the litigation. Young v. Logue, 94-0585 (La.App. 4 Cir. 5/16/95), 660 So.2d 32, 57, writs denied, 95-2575, 95-2585 (La.12/15/95), 664 So.2d 443 and 95-2597 (La.12/15/95), 664 So.2d 444. The reason for this preference is that the treating physician is more likely to know the patient's symptoms and complaints due to repeated examinations and sustained observations of the injured person. Devlin v. Westinghouse Elec. Corp., 96-484 (La.App. 5 Cir. 12/11/96), 686 So.2d 920, 928, writ denied, 97-0098 (La.3/14/97), 689 So.2d 1384; Schilling v. Bigelow Liptak Corp., 427 So.2d 452, 455 (La. App. 1 Cir.1982), writ denied, 433 So.2d 181 (La.1983).
Applying the foregoing standard of review, we find that the jury instructions, taken as a whole, adequately represented to the jury the law to be applied to this case. There is no showing that the jury was misled by the instructions or that substantial justice was precluded by the instructions, taken as a whole. There was ample testimony by the treating physician himself, as outlined hereinabove, to support the jury's verdict.

CONCLUSION AND DECREE
We reverse the judgment insofar as it dismisses James Riley's claim for loss of consortium and award him $2500 as compensation for that loss. In all other respects, the judgment of the trial court is affirmed.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
JONES, J., concurs in part and dissents in part.
JONES, Judge, concurring in part and dissenting in part.
I respectfully concur with the majority opinion regarding the applicability of comparative fault in this matter. The argument that Mrs. Riley could have mitigated her damages by reducing the number of items she was carrying out of the establishment and making multiple trips to her vehicle or seeking assistance from the dry cleaner attendant is well taken. Her failure to take such steps was unreasonable.
I further concur with the majority in finding that Mr. Riley has made a valid showing of entitlement for loss of consortium damages given the evidence presented at trial. His testimony was uncontroverted and the jury's refusal to honor his claim was manifest error.
However, I must dissent on the jury's allocation of 60% fault to Mrs. Riley. It has never been my belief that the redactors of LSA-C.C. art. 2322, intended that a plaintiff should bear the majority of the fault for his injuries simply because his damages were caused by a combination of a defect in the premises and his own unreasonable acts.
Of course, a negligent plaintiff should have his recovery reduced by his percentage of fault, but that percentage, especially in this case, should never supplant the owner's non-delegable obligation to secure the safety of its invitee while on his property. Burton v. Housing Authority of New Orleans, 623 So.2d 243, 246 (La.App. 4 Cir.1993). This duty does not and should not evaporate when the individual is not injured by the hazard upon initial contact.
Allowing the owner to bare less than 50% fault in the causation of damages to this victim not only dilutes his incentive to keep his premises in a reasonably safe condition, but it also gradually brings back the "assumption *168 of the risk" mentality when a plaintiff in someway contributes to his own peril.
NOTES
[1] See, LSA-Const. Art. 5, section 10(B).