TERRI F. LOVE, Judge.
11 This appeal arises from the illegal confinement of Willie Warren Harper following an acquittal of not guilty by reason of insanity for theft and a commitment to the custody of Louisiana Department of Health and Hospitals. Once released from custody, Mr. Harper filed a class action lawsuit seeking damages, but passed away. His children then filed suit against the State of Louisiana and the Louisiana De *483 partment of Health and Hospitals seeking damages individually and on behalf of their father. Mr. Harper’s class action petition was dismissed. Following a jury trial, the Louisiana Department of Health and Hospitals was found one hundred percent liable for Mr. Harper’s period of illegal confinement. The jury awarded $4,050,000.00 in damages to Mr. Harper’s children on his behalf and individually.
The State and the Louisiana Department of Health and Hospitals assert that: 1) the jury erred in finding that the Louisiana Department of Health and Hospitals had the authority to release Mr. Harper without a court order, 2) the “trial court erred in refusing to reduce the jury verdict pursuant to the statutory cap in La. R.S. 13:5106”, 3) the trial court erred in denying the exception of no cause of action as to the civil rights claims because neither the State, nor its agencies constitute a “person,” 4) the jury committed manifest error “in failing to allocate fault to the [gOrleans Parish Criminal Court ... the Orleans Parish Sheriffs Office; and Willie Harper,” 5) the jury committed manifest error “in finding the DHH liable for the entire period of Mr. Harper’s alleged illegal confinement,” and 6) the jury erred in awarding the plaintiffs individual damages because the jury found that the Louisiana Department of Health and Hospitals was not liable for Mr. Harper’s death.
After our review, all five judges on the panel found that the trial court erred by denying the defendants’ exception of no cause of action because the State and Louisiana Department of Health and Hospitals are not considered “persons” pursuant to § 1983. Four judges agreed that the Louisiana Department of Health and Hospitals did not possess the sole authority to release Mr. Harper without a court order. Four judges also found that the Louisiana Department of Health and Hospitals owed a duty to Mr. Harper and was liable for his wrongful detention. Three judges held that the children failed to meet their burden of proof sufficient for an award for loss of consortium. Accordingly, we find that the trial court abused its discretion by awarding the children $275,000.00 each for loss of consortium, pursuant to La. C.C. art. 2315, and vacate the awards. Four panel mémbers agreed that the trial court erred by refusing to limit the damage awards to $500,000.00 because the statutory cap applied at the time of judicial demand. Accordingly, and in compliance with Parfait v. Transocean Offshore, Inc., 07-1816 (La.9/19/07), 964 So.2d 928, we affirm in part, reverse in part, and render a judgment in favor of the children for $500,000.00.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On March 30, 1984, Willie Warren Harper was arrested for theft and possession of stolen property listed as, “aluminum pressure bars and door frames |sfrom the Louisiana World Exposition in downtown New Orleans, Louisiana.” On June 28, 1984, after being found incompetent to stand trial, Mr. Harper was committed to the Feliciana Forensic Facility (“FFF”), a part of the Department of Health and Hospitals (“DHH”), to restore his competency. On May 6, 1985, FFF deemed Mr. Harper competent to stand trial and transferred him to the custody of the Orleans Parish Sheriffs Office (“OPSO”) on June 26, 1985. The criminal court judge conducted a bench trial on August 14, 1985, and found Mr. Harper not guilty by reason of insanity (“NGRI”).[1]
On August 24, 1989, the criminal court judge found that Mr. Harper was not a *484 danger to himself or others and that he should be released on the condition that the Orleans Inmate Treatment Service (“OITS”) locate a suitable halfway house for Mr. Harper and/or assist him in applying for welfare and social security. The criminal court judge requested an update by September 1, 1989. On December 29, 1989, the criminal court judge ordered that Mr. Harper be released when suitable living arrangements were made by Mr. Harper’s counsel.
However, Mr. Harper remained in the custody of the OPSO until March 20,1990, when'he was transferred back to the custody of FFF. On January 7, 1992, the criminal court judge denied an FFF request to utilize excursion passes in furtherance of the deinstitutionalization of Mr. Harper. On June 27,1994, the criminal court judge ordered that Mr. Harper be transferred within DHH to East Louisiana State Hospital (“ELSH”). Mr. Harper was moved to ELSH on December 6, 1994. On February 16, 1996, the criminal court judge signed an order permitting Mr. Harper to use family excursion passes. Subsequently, while on conditional release, Mr. Harper tested positive for cocaine usage on several of- [4his visits with the after-care clinic. .
On October 22, 1997, counsel for Mr. Harper filed an Emergency Application for a Writ of Habeas Corpus, which was granted on October 29, 1997. On December 3,1997, the criminal court judge issued a judgment that recalled the original judgment as erroneous, but Mr. Harper remained uncdnditionally discharged.
Following Mr. Harper’s release from custody, he filed á Class Action Petition for Certification and Damages stemming from his alleged illegal confinement and sought to have the petition certified as a class action. However, Mr. Harper passed away on November 14, 2003.[2] Sharon Harper and Michael Johnson Harper, as Mr. Harper’s children (collectively “Plaintiffs”), filed a Petition for Damages against the State of Louisiana, through DHH and DHH (collectively “Defendants”) after the death of their father.
The Defendants filed a Motion for Partial Summary Judgment asserting that an award to the Plaintiffs would be subject to the application of the $590,000.00 statutory cap on damages, pursuant to La. R.S. 13:5106. The trial court granted the Defendants’ Motion for Partial Summary Judgment and found that the $500,000.00 statutory cap applied.
Following a nine-day jury trial, the jury found that DHH possessed the authority to release Mr. Harper with or without a court order, from August 14,1985, through January 22, 1997. The jury found that DHH owed a duty to Mr. Harper to release him from custody and. that DHH violated that duty. However, the jury found that no actions or inactions of the “Orleans Parish Criminal Court [^judges and staff, the Orleans Parish Criminal Clerk-of Court and its staff, the Orleans Parish Sheriffs Office, State of Louisiana through DHH (OITS Program), Charles Foti, Jr., the Indigent Defender Attorneys and/or Willie Harper” constituted “an independent intervening cause” of Mr. Harper’s alleged illegal confinement from August 14, 1985, through January 22, 1997. While the jury found that DHH was not liable for Mr. Harper’s alleged wrongful death, DHH was found one hundred percent liable for his extended confinement. The jury awarded $4,050,000.00 in damages.[3] The trial court entered a judgment *485 on the jury verdict. The Defendants filed a Motion for Judgment Notwithstanding the Verdict or a New Trial and exceptions of no cause of action and no right of action regarding the 42 USC § 1983 claims and the trial court’s failure to,apply the statutory cap based on law and the trial court’s prior ruling that the statutory cap applied. The trial court denied all of the Defendants’ requested relief. The Defendants’ suspensive appeal followed.
RThe Defendants contend that: 1) the jury erred in finding that DHH had the authority to release Mr. Harper without a court order, 2) the “trial court erred in refusing to reduce the jury verdict pursuant to the statutory cap in La. R.S. 13:5106,” 3) the trial court erred in denying the exception of no cause of action as to the civil rights claims because neither the State, nor its agencies constitute a “person,” 4) the jury committed manifest error “in failing to allocate fault to the Orleans Parish Criminal Court ... the Orleans Parish Sheriffs Office; and Willie Harper,” 5) the jury committed manifest error “in finding the DHH hable for the entire period of Mr. Harper’s alleged illegal confinement,” and 6) the jury erred in awarding the Plaintiffs individual damages because the jury found that DHH was not hable for Mr. Harper’s death.

STANDARD OF REVIEW

Factual findings are reviewed by appellate courts using the manifest error/clearly wrong standard of review. Hall v. Folger Coffee Co., 03-1734, p. 9 (La.4/14/04), 874 So.2d 90, 98. There are two prerequisites for reversing a factfin-der’s determination. Stobart v. State through Dep’t of Transp. & Dev., 617 So.2d 880, 882 (La.1993). First, “[t]he appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court.” Id. Second, “the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).” Id. “[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but-whether *486 the factfinder’s conclusion was a reasonable one.” Id.
“Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact-finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict |7exists in the testimony.” Id. “However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’s story, the” appellate court “may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.” Id. “[W]here two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.” Id., 617 So.2d at 883. “The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently.” Detraz v. Lee, 05-1263, p. 7 (La.1/17/07), 950 So.2d 557, 561.
Questions of law, on the other hand, are reviewed utilizing the de novo standard of review. Harold A. Asher, CPA LLC v. Haik, 12-0771, p. 5 (La.App. 4 Cir. 4/10/13), 116 So.3d 720, 724. When the law is erroneously applied by the trial court, the de novo standard of review is also used. Kevin Associates, L.L.C. v. Crawford, 03-0211, p. 15 (La.1/30/04), 865 So.2d 34, 43.

TRIAL TESTIMONY

Sharon testified that Mr. Harper was her father and a professional singer. When she was a child, Mr. Harper would pick her up after school and take her to “play.” Sharon continued to see Mr. Harper after her parents’ separation. While Sharon attended college, she and her father would speak occasionally, about once every three months. She visited Mr. Harper at FFF twice. Sharon testified that Mr. Harper would telephone about three times a week. Mr. Harper attended Sharon’s wedding in 1996, and used some weekend excursion passes to visit.
Michael also testified that Mr. Harper was his father. Mr. Harper lived with him until he was eight or nine. While Mr. Harper was located at FFF, Michael | stestified that they would speak often. Michael visited his father there once and stated that Mr. Harper wrote him. Mr. Harper did not use weekend excursion passes to visit with Michael.
Retired judge, Miriam Waltzer,[4] testified regarding Mr. Harper’s criminal court proceedings. Judge Waltzer stated that nothing in the criminal court record indicated that Mr. Harper was a danger to himself or others and that Mr. Harper should have been released from custody after her judgment finding him NGRI. Judge Waltzer testified that she did not know why Mr. Harper’s docket master was marked “closed” after his trial. There were no subsequent hearings listed in the docket master to determine whether Mr. Harper was a danger to himself or others. However, Judge Waltzer testified that she “would have held that hearing and [she] would have issued a judgment.” In regards to the judgment for that hearing, Judge Waltzer stated, “[w]here that thing went, I do not know.” Judge Waltzer examined docket master entries regarding various attempts to find Mr. Harper suitable housing for a conditional release from custody. Judge Waltzer stated that she “didn’t want a headline in the newspaper that said that Judge Waltzer released *487 somebody who was found on the street totally, you know, bereft of all humanity because he had been tossed out and he had nobody.”
Dr. Edward Levy, the Plaintiffs’ expert in psychiatry, examined Mr. Harper pursuant to orders from the criminal court judge and found him competent to stand trial in July 1985.
Dr. Ciro Juarez-Nunez, an expert in the field of psychiatry, worked as one of two treating psychiatrists for OITS. Dr. Juarez-Nunez testified that once someone was found NGRI, they would be placed in the State’s custody. Once a person is | cicommitted, then he is under the legal care of DHH, but physically in the care of the OPSO.
Dr. Martha Wickett testified that she prepared the report on Mr. Harper in 1984, regarding his competency to stand trial. Dr. Wickett found that Mr. Harper was unable to assist his attorney and was unable to understand the seriousness of the charges against him. Accordingly, Dr. Wickett found that Mr. Harper was incompetent to stand trial. However, Dr. Wick-ett did not have any independent recollection of Mr. Harper.
Adrienne LaCour, a fact witness for the Plaintiffs and a former assistant district attorney, testified that once a defendant was determined to be NGRI, then a hearing would be conducted to determine whether the defendant could be released under supervision or kept in custody. Ms. LaCour testified that the record was unclear as to why Mr. Harper did not receive a follow-up hearing after he was found NGRI.
Emily Morrison testified that she worked with the State’s counsel while researching trial court files. Ms. Morrison located a portion of Mr. Harper’s court files in another criminal defendant’s file.
Dr. Eleanor Krimerman, the Defendants’ expert in the field of psychiatry, was appointed by the criminal court judge to examine Mr. Harper. Dr. Krimerman testified before the criminal court judge that Mr. Harper was competent to stand trial. Dr. Krimerman was appointed to examine Mr. Harper again in 1989, and found that he was not a danger to himself or others. Having found that Mr. Harper was not a danger to others, Dr. Krimerman recommended that Mr. Harper be released from custody and attend a mental health center for a least a year. Dr. Krimerman stated, in her report that “[h]e seemed delusional in that he talked |inabout making hit records and” Mr. Harper “seemed rather confident that he could get a recording contract to sing after he got out of prison.” Dr. Krimerman testified that she was unaware of Mr. Harper’s alleged previous singing career.[5] She would not have labeled Mr. Harper as delusional based on those statements if she had known of his alleged singing career.
Larry Turner, a social worker and head of OITS, testified that the OPSO determined where people were housed, but that medication was provided through DHH. Mr. Turner worked for DHH from 1979 to 2006. Mr. Turner stated that a court order was necessary to release a prisoner. Mr. Turner testified that Judge Waltzer asked him to locate a group home placement for Mr. Harper, but that Mr. Harper *488 did- not meet the criteria of the group home chosen.
Mark Ott, a psychiatric social worker, was the administrator and CEO of the program at FFF. Mr. Ott testified that FFF was a legal program operated in the court system and that people entered and exited the program by court order.
Dr. Sarah DeLand, the Defendants’ expert in general psychiatry and the specialty of forensic psychiatry, worked as the clinical director for the forensic after-care clinic that started to see Mr. Harper after his “standard conditional release” from ELSH. Mr. Harper visited the after-care clinic for “his psychiatric and mental health treatment as well as monitoring and supervision and reporting” prior to the granting of Mr. Harper’s Writ of Habeas Corpus, which released him from DHH custody completely. Dr. DeLand diagnosed Mr. Harper with schizoaffective disorder. She testified that Mr. Harper tested positive for cocaine j nusage while under the care of the after-care clinic.
Dr. Richard Richoux, another defense expert in psychiatry and forensic psychiatry, testified that Mr. Harper was schizophrenic and occasionally psychotic. Dr. Richoux stated that the criminal court judge determined releases or transfers from the hospital or the usage of excursion passes. Dr. Richoux testified that FFF was not mandated to look for housing for prisoners.
Dr. John Thompson, Jr., the Defendants’ final expert in general psychiatry and forensic psychiatry, worked in conjunction with the State Forensic Hospital beginning in 1993, and now functions as the head of FFF. Dr. Thompson, Jr. evaluated Mr. Harper. He subsequently held a review panel of Mr. Harper in April 1994, after reviewing his past medical records. Dr. Thompson, Jr. testified, from the records, that FFF made recommendations regarding Mr. Harper’s condition and release to the criminal court judge, but never received any responses. On cross-examination, Dr. Thompson, Jr. was asked if the record contained any “green cards” certifying or serving as proof that the criminal court judges, received FFF’s correspondence. He replied that there were no “green cards” or certifications.
Clay Calhoun, the first director of Community Forensic Services for DHH and an attorney who worked with OITS on the waiting list, testified that he routinely experienced problems with criminal court judges failing to hold a “dangerousness” hearing after being found NGRI. Mr. Calhoun further stated that he had trouble getting paperwork from criminal court judges regarding NGRI hearings and the follow-up “dangerousness” hearings.

AUTHORITY TO RELEASE MR. HARPER

The Defendants contend that the jury erred as a matter of law in finding that DHH could release Mr. Harper without a criminal court order because numerous |12witnesses testified that a criminal court order for release was required.
La.C.Cr.P. art. 654 provides that:
[w]hen- a defendant is found-not guilty by reason of insanity in any other felony case, the court shall remand him to the parish jail or to a private mental institution approved by the court and shall promptly hold a contradictory hearing at which the defendant shall have the burden of proof, to determine whether the defendant can be discharged or can, be released on.probation, without danger to others or to himself.
“When the superintendent of a mental institution is of the opinion that a person committed pursuant to Article 654 can be discharged or can be released on proba *489 tion, without danger to others or to himself, he shall recommend the discharge or release of the person in a report to a review panel....” La.C.Cr.P. art. 655(A). “After review, the.panel shall make a recommendation to the court by which the person was committed as to the person’s mental condition and whether he can be discharged, conditionally or unconditionally, or placed on probation, without being a danger to others or himself.” La.C.Cr.P. art. 655(A). “If the review panel recommends to the court that the person be discharged, conditionally or unconditionally, or placed on probation, the court shall conduct a contradictory hearing following notice to the district attorney.” La.C.Cr.P. art. 655(A).
DHH contends that the criminal court judge was unresponsive to correspondence documenting compliance with the required procedures. However, the Plaintiffs assert that there is no proof in the record that the criminal court judge received the alleged correspondence. Further, the Plaintiffs contend that the judgments instructing DHH to release Mr. Harper constituted enough evidence for reasonable jurors to conclude that DHH possessed the authority to release Mr. Harper. We disagree.
1 isThe criminal court judge issued two judgments in 1989 finding that Mr. Harper was not a danger to himself or others and that he should be released with suitable living arrangements. Suitable living " ar: rangements were required prior to Mr. Harper being released. The conditions were never met.
Mr. Turner, the former head of OITS, testified that a court order was required to discharge a prisoner. The criminal court judge asked that he find Mr. Harper a placement in a group home. Mr. Turner contacted one group home and was told that Mr. Harper did not meet the admittance criteria. Thereafter, Mr. Turner did not look for any other placements for Mr. Harper.
Mr. Ott testified that Mr. Harper could not be released without an order from the criminal court judge. Mr. Ott stated that “seven guys”[6] were released from FFF based on Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).[7] Mr. Calhoun also testified that only a judge could release a prisoner.
Accordingly, given the overwhelming evidence and testimony presented at trial that only a criminal court'order could release a prisoner and that the only orders issued in the case sub judice contained conditions for release which were never met, we find that one reasonable conclusion could be reached by the jury. The jury could not have reasonably concluded that DHH possessed the sole authority to release Mr. Harper without a court order. Therefore, we find that DHH did not possess the sole authority to release Mr. Harper without a court order, and we reverse.

J^ALLOCATION OF FAULT

Defendants assert that the jury committed manifest error “in failing to allocate fault to any of the other entities that caused Mr. Harper’s confinement” and for “finding DHH liable for the entire period of Mr. Harper’s alleged illegal confinement.”
“When the district court has allowed both parties to present their ex *490 perts before making its factual determinations, the factfinder’s choice of alternative permissible views cannot be considered to be manifestly erroneous or clearly wrong.” Toston v. Pardon, 03-1747, p. 12 (La.4/23/04), 874 So.2d 791, 800. “However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’s story,” we “may find manifest error even in a finding purportedly based on a credibility determination.” Id. “Whether a fact-finder determines a party to be one percent at fault, totally at fault, or somewhere in between, the manifest error rule applies.” Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124, 126 (La.App. 2nd Cir. 1984). “Different juries and jurors may often give dissimilar apportionment.” Id.
“[T]he allocation of fault is not an exact science, or the search for one precise ratio.” Riley v. Reliance Ins. Co., 97-0445, p. 6 (La.App. 4 Cir. 11/19/97), 703 So.2d 158, 163. “Rather, it is an acceptable range and any allocation by the jury within that range cannot be ‘clearly wrong.’ ” Id., quoting Clement v. Frey, 95-1119, 95-1163, p. 7 (La.1/16/96), pp. 7-8, 666 So.2d 607, 610-11. “Only after making a determination that the trier of fact’s apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is [^reasonably within the trial court’s discretion.” Duncan v. Kansas City S. Ry. Co., 00-0066, p. 11 (La.10/30/00), 773 So.2d 670, 680-81.
During the nine days of trial, the jury was presented with lengthy testimony and voluminous record evidence. After hearing the testimony and reviewing the evidence, the jury concluded that DHH possessed the sole responsibility and authority to release Mr. Harper without a court order. As discussed above, we found that DHH did not possess the sole authority to release Mr. Harper without a court order.
Judge Waltzer testified that Mr. Harper’s criminal court record did not indicate that he was a danger to himself or others, so he should have been released from custody following the finding of NGRI. Judge Waltzer did not know why Mr. Harper’s file was marked “CLOSED” a little over ten days after he was found NGRI. Judge Waltzer stated that she would have held the secondary contradictory hearing to determine if Mr. Harper was a danger to himself or others. She opined that a notation of the hearing must be missing from the docket master. Judge Waltzer later ordered that Mr. Harper be released once suitable living arrangements were made. Mr. Harper’s criminal court docket master sheet stopped in 1985, and resumed in 1989.
Dr. Juarez-Nunez testified that once a person was found NGRI, then he would have been in the State’s custody. Dr. Juarez-Nunez also stated that once someone is committed, he is under the legal care of DHH.
The record reveals that criminal court did not hold a second contradictory hearing for Mr. Harper after he was found NGRI, pursuant to La.C.Cr.P. art. 654. In fact, the record demonstrates that criminal court marked Mr. Harper’s file as “CLOSED” once he was found NGRI. While the medical records reflect that FFF | ^routinely evaluated Mr. Harper’s condition, the record did not contain proof that the FFF documents were received by the criminal court judge. Criminal court did not respond to these FFF documents. The criminal court records included two judgments rendered in 1989, which found that Mr. Harper should be released once certain requirements for living conditions *491 were met because he was not a danger to himself or others. However, those conditions were not met, and the criminal court judge did not issue an order releasing Mr. Harper unconditionally.
Mr. Harper was transferred to the custody of the OPSO after he was found NGRI in 1985, until 1990, when he was transferred back to FFF. For these years the OPSO did not contact anyone regarding Mr. Harper’s status.
Further, the Orleans Indigent Defender Program[8] (“OIDP”) was responsible for representing Mr. Harper. However, the OIDP did not file a motion on Mr. Harper’s behalf to ensure that he received the second contradictory hearing to determine if he was a danger to himself or others. OIDP also failed to file pleadings to check on Mr. Harper’s status from 1985 to 1989, while he was in the custody of the OPSO. The criminal court judge also ordered OIDP to find Mr. Harper a suitable place to live. However, like OITS and the criminal court, OIDP failed to do so.
From the evidence presented, it is clear that DHH, OPSO, criminal court, and OIDP all contributed to Mr. Harper’s wrongful confinement. Therefore, we find that the, jury committed manifest error in concluding that DHH was solely liable for the entire time period of Mr. Harper’s confinement. Pursuant to case [17law, we must raise and lower the fault apportionment to percentages which were within the trial court’s discretion. Criminal court failed to hold the hearing for Mr. Harper regarding whether he was dangerous to himself or others and marked his file “CLOSED.” Accordingly,- we find that criminal court be apportioned thirty percent fault for Mr. Harper’s wrongful confinement. OIDP failed to file motions and pleadings on behalf of their client for years. As such, we find that it is twenty percent liable. The OPSO held Mr. Harper from 1985 to 1990 without checking his status with criminal court or DHH. Therefore, the OPSO is allotted fifteen percent fault. DHH is then attributed with the remaining thirty-five percent liability for Mr. Harper’s wrongful confinement. We reverse, and reapportion fault as described above.[9]

INDIVIDUAL DAMAGES

Defendants contend that [t]he jury erred in awarding Sharon Harper and Michael Harper damages individually because the jury found that DHH did not cause Mr. Harper’s death. The jury awarded separate awards to both Sharon and Michael as follows:
Loss of love and affection: $75,000.00
Loss of nurture and support: $50,000.00
Loss of society: $50,000.00
Mental anguish: _ $50,000.00
_ Emotional stress and strain:" $50,000.00
Total: $275,000.00
“Although both actions arise from a common tort, survival and wrongful death actions are separate and distinct.” Taylor v. Giddens, 618 So.2d 834, 840 (La. *492 1998). “Each' right arises at a different time and addresses itself to the recovery of damages for totally different injuries and losses.” Id.
l.is“The right to recover all damages for” a person’s injuries, damage to “his property or otherwise, caused by the offense or quasi offense, shall survive for a period of one year from the.death of, the deceased in favor of’ the person’s children. La. C.C. art. 2315.1. “The survival action comes into existence simultaneously with the tort, permits .recovery only for the damages suffered by the victim from the time of injury to the moment of death, and is transmitted to the victim’s beneficiaries upon his death.” Boullt v. State Farm Mut. Auto. Ins. Co., 99-0942 (La.10/19/99), 752 So.2d 739, 743-44.
“If a person dies due to the fault of another, suit may be brought by the” children “to recover damages which they sustained as a result of the death.” La. C.C. art. 2315.2. “[T]he wrongful death action arises only if and when the victim dies and compensates the beneficiaries for their own individual injuries that occur at the moment of the victim’s death and thereafter.” Boullt, 99-0942, 752 So.2d at 744.
The jury found that DHH was not responsible- for Mr. Harper’s death. Therefore, Plaintiffs are not entitled to wrongful death damages. However, Plaintiffs assert that La. C.C. art. 2315(B) supports the jury’s individual damage awards to Sharon and Michael for loss, of consortium. La. C.C. art. 2315(B) provides:
B. Damages may ineludé loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person. . Damages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease. Damages shall include any sales taxes paid by the owner on the repair or replacement of the property damaged. •
Plaintiffs sought relief pursuant to La. C.C. art. 2315, et seq. in them Petition for Damages filed in 2003. “The new provision for consortium damages in Article 2315 does not state that recoyery of such damages is restricted to wrongful death cases.” Ferguson v. Burkett, 454 So.2d 413, 416 (La.App. 3rd Cir.1984). Therefore, Plaintiffs’ assertion has merit.[10]
“A loss of consortium award is a fact-specific determination, to be decided case-by-case.” Turner v. Lyons, 03-0186, p. 12 (La.App. 4 Cir. 1/28/04), 867 So.2d 13, 21. “[T]he initial inquiry is whether the award for the particular injuries and their effects, under the particular circumstances, on the particular injured person is a clear abuse of the ‘much discretion’ vested in the judge or jury.” Id., 03-0186, p. 9, 867 So.2d at 20. “[A]n award for loss of consortium .is properly made where there has been some measurable or compensable loss, such as loss of love and affection, society and companionship, right of performance of material services, right of sup *493 port, aid and assistance, and. felicity.” Id., 03-0186, p. 13, 867 So.2d at 22, quoting Armstrong v. Fireman’s Fund Ins. Co., 558 So.2d 646 (La.App. 1st Cir.1990). “[W]hen the award, in either direction, is beyond that which a reasonable trier of fact could assess for effects of a particular injury to a particular plaintiff under particular circumstances, should an appellate court increase or reduce award.” Id., 03-0186, p. 9, 867 So.2d at 20. “Upon finding an abuse of discretion, the award can only be raised (lowered) to the highest (lowest) point, which is reasonably within the discretion of the trial court.” Id.
| sfiSharon testified that she would wait for her father to “come home” when she was “a little girl” and that he would “always pick” her “up and play-with” her. Sharon stated that Mr. Harper would schedule to take her places after her parents’ separation. While in college, Sharon would speak to Mr. Harper' occasionally, about once every three months, and then “periodically” after she relocated back to New Orleans. Mr. Harper “very seldom” sent her money. Sharon testified that she could “[u]sually ... get in touch with him through relatives.” Sharon stated that her father disappeared around 1984, and she eventually discovered that he was in a mental facility around 1994 or 1995. Sharon visited Mr. Harper twice while he was detained at FFF and he telephoned her about three times a week. Mr. Harper utilized an excursion pass to attend her wedding in 1996.
Michael stated that he remembered his father as a “sweet man” that lived with him until he was about eight or nine years old. After his parents separated, Michael testified that Mr. Harper continued to “come around” and that Mr. Harper introduced him to his older sister, Sharon. Mr. Harper “wasn’t there when [he] was in high school.” Michael 'graduated from high school in 1985. During the years Michael was in college at Delgado he made no attempts to find his father and relied upon Sharon to find Mr. Harper. Michael stated that Mr. Harper “would call [him], maybe like a lot” or “like every weekend” while confined. Mr. Harper allegedly sent him a $300 check once. Michael visited his father once “like right before he got out” and stated that Mr. Harper wrote him. Neither Sharon nor Michael continuously remained in contact with their father before or after his confinement.
“[W]hile ‘every personal injury tends to decrease the parties’ overall happiness,’ it is the plaintiff who carries the burden of proving a definite loss on |21each element of damages.” Gradnigo v. Louisiana Farm Bureau Cas. Ins. Co., 08-1198, p. 15 (La.App. 3 Cir. 3/4/09), 6 So.3d 367, 377, quoting Finley v. Bass, 478 So.2d 608, 614 (La.App. 2nd Cir.1985). “ ‘Ordinarily,the parent’s duty to provide largely disappears when the child attains majority, unless the child is still in school, less than nineteen years old, and dependent.’ ” Turner, 03-0186, p. 13, 867 So.2d at 22; quoting Sebastien, et al. v. McKay, M.D., et al., 94-203, p. 6 (La.App. 3 Cir. 11/23/94), 649 So.2d 711, 715.
“An award for loss of consortium is only proper where there has been some measurable or compensable loss.” Leckelt v. Eunice Superette, Inc., 555 So.2d 11, 13 (La.App. 3rd Cir.1989). After reviewing Sharon and Michael’s scant testimony, we find that insufficient evidence exists to sustain an award for the loss of consortium, in that a measurable or compensable loss was not proven. See Johnmeyer v. Creel, 499 So.2d 571, 576 (La.App. 2nd Cir.1986). Sharon and Michael did not garner any financial support from. their father and were essentially estranged from him with limited contact and communication. That limited contact and communication was not *494 impaired during Mr. Harper’s confinement. Accordingly, we find that the Plaintiffs failed to prove they suffered a meas-ureable and compensable loss and that the jury erred by awarding $275,000.00 each to Sharon and Michael for loss of consortium. Therefore, we reverse, and vacate the awards.

NO CAUSE OF ACTION

The Defendants aver that the trial court erred in denying their peremptory exception of no cause of action regarding civil rights violations because the State and its agencies are not categorized as “persons” pursuant to 42 U.S.C. § 1983.
“The peremptory exception may be pleaded at any stage of the proceeding in 122the trial court prior to a submission of the case for a decision.” La. C.C.P. art. 928(B). “The purpose of an exception of no cause of action is to determine the sufficiency in law of the pleading setting forth the claim or demand.” Bd. of Examiners of Certified Shorthand Reporters Through Juge v. Neyrey, 542 So.2d 56, 64 (La.App. 4th Cir.1989).
Two requirements must be met to state a cause of action pursuant to § 1983. Neyrey, 542 So.2d at 66. “First, the conduct complained of must have been committed by a person acting under color of state law, and second, this conduct must have deprived the plaintiff of rights, privileges and immunities secured by the United States Constitution or laws of the United States.” Id. This Court held that “States and arms of state government are not persons who may be sued under” § 1983. Id. See also Richard v. Bd. of Sup’rs of Louisiana State Univ. & A & M Coll., 06-0927, pp. 19-21 (La.App. 1 Cir. 3/28/07), 960 So.2d 953, 965-66; Varnado v. Dep’t of Employment & Training, 95-0787, p. 8 (La.App. 1 Cir. 6/28/96), 687 So.2d 1013, 1022; Louisiana Farms v. Louisiana Dep’t of Wildlife & Fisheries, 95-845, p. 9 (La.App. 3 Cir. 10/9/96), 685 So.2d 1086, 1092; LaBauve v. State, 618 So.2d 1187, 1191 (La.App. 3rd Cir.1993). “[S]tate agency’ means any board, commission, department, agency, special district, authority, or other entity of the state.” La. R.S. 13:5102(A).
Because a State and its agencies are not considered “persons” pursuant to § 1983, we find that the trial court committed legal error by denying the Defendants’ exception of no cause of action.
However, this Court found that the United States Supreme Court implied that 1983 immunity could be waived. Sommer v. State, Dep’t of Transp. & Dev., 97-1929, p. 22 (La.App. 4 Cir. 3/29/00), 758 So.2d 923, 937. (Emphasis added). Thus, Plaintiffs contend that § 1983 immunity can be waived. Having addressed the above statutory question and found that the Plaintiffs did not possess a cause of action against the Defendants pursuant to § 1983, we need not reach the issue of this potential defense to a valid § 1983 claim. We note that the Defendants plead the defense of “qualified immunity and/or the doctrine of privilege.” Additionally, Sommer did not expressly overrule the previously cited vast amount of jurisprudence of Louisiana or the United States Supreme Court in Will v. Michigan Dep’t of State Police, 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989), which found that a state was not a “person” pursuant to § 1983.
Further, the Plaintiffs contend that the State may be liable for the tort actions of employees, but that the claim “must be predicated upon ‘gross negligence’ amounting to ‘conscious indifference’ and there must be a pattern' or practice of constitutional violations supporting the theory of gross negligence.” Price v. Louisiana *495 Dep’t of Transp. & Dev., 608 So.2d 203, 209 (La.App. 4th Cir.1992). Plaintiffs also aver that the jury “had ample grounds to determine that DHH was both ‘consciously indifferent’ to Harper’s situation and engaged in a pattern and practice of constitutional violations in detaining Harper.” However, the issues of gross .negligence or conscious indifference were not placed before the jury by the trial court. Therefore, we vacate the jury’s $2,000,000.00 award for civil rights damages, as the trial court should have granted the exception of no cause of action because the State and state agencies are not considered “persons” pursuant to § 1983.

STATUTORY CAP

The Defendants assert that the trial court erred as a matter of law in failing to reduce the jury awards pursuant to La. R.S. 13:5106. .
|MThe history of the statutory cap follows:
In 1985, the legislature passed Act No. 452 which amended La. R.S. 13:5106 to establish a $500,000 limitation on general damages in suits against the state, a state agency, or political subdivision. In Chamberlain v. State, Through DOTD, 624 So.2d 874 (La.1993), the Louisiana Supreme Court declared the statute to be unconstitutional, finding that it conflicted with Article XII, Section 10(A) of the Louisiana Constitution. In 1995, the legislature passed Act 1328 which proposed the amendment of Article XII, Section 10(C) of the Constitution to allow the legislature to “limit or provide the extent of liability of the state, a state agency, or a political subdivision in all cases.” Act 1328 was approved by the people of this state and beeame effective November 23, 1995.
In conjunction with Act 1328, the legislature enacted Act 828 which amended La.R.S. 13:5106(B)(1) to limit the recovery of general damages to “the limit of liability in effect at the time of judicial demand.” As of the effective date of the amendment, the limit of liability was $750,000. Thereafter, the limit of liability would be established on January 1 of each year by the Commissioner of Financial Institutions. In 1996, La. R.S. 13:5106(B)(1) was amended again to re-institute a fixed limit of liability of $500,000 on general damages. See Act 63 of 1996.
Castille v. State ex rel. Dep’t of Transp. & Dev., 99-1334, pp. 1-2 (La.App. 3 Cir. 2/2/00), 758 So.2d 823, 824-25. The phrase: “at the time of judicial demand” was no longer necessary because the amount óf the statutory cap was now a fixed limit of liability. Id., 99-1334, p. 5, 758 So.2d at 826-27. La. R.S. 13:5106(B)(1) now provides that:
B. (1) The total liability of the state and political subdivisions for all damages for personal injury to any one person, including all claims and derivative claims, exclusive of property damages, medical care and related benefits and loss of earnings,' and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars, regardless of the number of suits filed or claims made for the personal injury to that person.
The Plaintiffs contend that Mr. Harper’s right to sue arose in 1985, and that | gfjhis right to recover monetary damages without a statutory cap vested prior to the enactment pf the statutory cap. This argument lacks merit. Jurisprudence dictates that the date of judicial demand determines whether the statutory cap applies. See Brown v. Louisiana Indem. Co., 96-1393, p. 3 (La.App. 3 Cir. 4/23/97), 693 So.2d 270, 272. See also Lewis v. State, 96-1586, p. 6 (La.App. 1 Cir. *496 12/20/96), 685 So.2d 640, 643; Farley v. State Through Dep’t of Transp. & Dev., 96-0538, 960539 p. 5 (La.App. 1 Cir. 9/27/96), 680 So.2d 750, 753; Holt v. State Through Dep’t of Transp. & Dev., 28,183, p. 15. (La.App. 2 Cir. 4/3/96), 671 So.2d 1164, 1174; Begnaud v. Dep’t of Transp. & Dev., 95-714, 95-715, p. 19 (La.App. 5 Cir. 2/14/96), 679 So.2d 113.
The date of judicial demand in the case sub judice was December 5, 2003, when the Plaintiffs -filed their petition while the statutory cap[11] was effective. Additionally, the trial court found that the statutory cap applied when it granted the Defendants’ Motion for Partial Summary Judgment on the issue.[12] However, the trial court failed to apply that ruling when entering the jury’s verdict.[13] Given that the Plaintiffs filed their petition on December 5, 2003, when the statutory cap pursuant to La. R.S. 13:5106 was effective, we find that the trial court erred by refusing to limit the Plaintiffs’ damage awards to $500,000.00. Accordingly, we reverse, and apply the statutory cap to the final damage awards. . ,

DECREE

For the above-mentioned reasons, we find that DHH did not possess the sole authority to release Mr. Harper without a court order, and reverse. The evidence | ¡^demonstrated that DHH was responsible for Mr. Harper’s confinement. The jury abused its discretion by awarding Sharon and Michael $275,000.00 for loss of consortium because they failed'to present proof of a measurable loss. Accordingly, we vacate the awards for civil rights violations and Sharon and Michael’s individual damages.- The trial court erred by denying Defendants’ exception of no cause of action because the State and DHH are not considered “persons” pursuant to § 1983. Lastly, the trial court erred by refusing to limit the Plaintiffs’ damage awards to $500,000.00, pursuant to the statutory cap. We affirmed the $1,500,000.00 in damages awarded on behalf of Mr. Harper’s wrongful detention. DHH’s thirty-five percent of liability equals $525,000.00. Once reduced . in compliance with the statutory cap, $500,000.00 is awarded. Consistent with our findings, we affirm in part, reverse in part, and render.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED
DYSART, J., concurs in part and dissents in part.
LANDRIEU, J., concurs in part and dissents in part.
LOBRANO, J., concurs in part, dissents in part, and assigns reasons.

. Mr. Harper suffered from chronic paranoid schizophrenia.

. Mr. Harper’s class action petition was dismissed on February 17, 2006.

.

Willie Harper:

Wrongful Detention:
$500,000.00 Conscious pain and suffering:
$500,000.00 Mental anguish:
$500,000.00 Emotional stress and strain:
Civil Rights Violation:
. $500,000.00 Conscious pain and suffering:
$750,000.00 Mental anguish:
$750,000.00 Emotional stress and strain:

Sharon Harper:

. $75,000.00 Loss of love and affection: -
$50,000.00 Loss of nurture and support:
$50,000.00 Loss of society:
$50,000.00 Mental anguish:
$50,000.00 Emotional stress and strain:
$0.00 Wrongful death of Willie Harper:

Michael Harper:

$75,000.00 Loss of love and affection:
$50,000.00 Loss of nurture and support:
$50,000.00 Loss of society:
$50,000.00 Mental anguish:
$50,000.00 Emotional stress and strain:
$0.00 Wrongful death of Willie Harper:
$4,050,000.00 Total:

. Judge Waltzer served as a trial court judge and an appellate court judge.

. Counsel for the Plaintiffs asserted during the entire trial that Mr. Harper "was extremely successful in the music industry" prior to his confinement and sang with the Allen Tous-saint band, Ernie K-Doe, vocals on "Working on the Chain Gang,” etc. However, no evidence of this was admitted into the record aside from testimony and a “Google” search conducted in front of the jury.

. The seven men included Mr. Foucha.

. The Plaintiffs contend that Foucha mandated the release of Mr. Harper. However, we find Foucha distinguishable in that the Fou-cha plaintiff was not considered to be mentally ill. Foucha, 504 U.S. at 86, 112 S.Ct. at 1788.

. Following Hurricane Katrina, OIDP became known as Orleans Public Defenders or OPD.

. While the fourth judge holding DHH liable found only DHH liable, four judges, a majority of the panel, find DHH liable, at least in part, for Mr. Harper’s unlawful detainment. See Parfait v. Transocean Offshore, Inc., 07-1816 (La.9/19/07), 964 So.2d 928.

. Mr. Harper was released in 1997. Plaintiffs had one year from that date to file suit based on loss of consortium to avoid prescription. La. C.C. art. 3492. Plaintiffs’ Petition for Damages was filed in 2003. Thus, their claims for loss of consortium should be prescribed. However, "[t]he court may not supply the objection of prescription, which shall be specially pleaded.” La. C.C.P. art. 927. Therefore, as no party alleged that loss of consortium damages' were prescribed, we must determine whether the jury abused its .discretion by awarding Sharon and Michael each $275,000.00 for loss of consortium.

. The statutory cap has been $500,000.00 since the 1996 Legislative session.

. Plaintiffs did not seek supervisory review of this judgment.

.The trial court denied the Defendants' Motion. for Judgment Notwithstanding the Verdict or a New Trial based on the trial court's failure to apply the statutory cap pursuant to the law and the trial court’s prior ruling.